**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MICHELE MILLAR,**<br>**Plaintiff,**<br>**v.**<br>**NORTHEAST SNF OPERATIONS, LLC *d/b/a* BRYN MAWR VILLAGE,**<br>**Defendant.** | **CIVIL ACTION NO. 25-6835** |

## MEMORANDUM OPINION

**Rufe, J.** **July 31, 2026**

Plaintiff Michele Millar filed a Complaint against Defendant Northeast SNF Operations, LLC d/b/a Bryn Mawr Village (the "Village") alleging wrongful termination. Plaintiff brings three claims against the Village, including violations of the False Claims Act (Count I), Pennsylvania common law wrongful termination (Count II), and the Pennsylvania Older Adults Protective Services Act ("OAPSA") (Count III). The Village has filed a partial Motion to Dismiss Count III for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated herein, the partial Motion to Dismiss will be denied.

## I. BACKGROUND[1]

The Village is a corporation that provides long-term and senior living care to older adults in Pennsylvania.[2] It provides medical care including "short-term subacute care featuring a wide range of physical, occupational, orthopedic and speech therapy, adult daycare programs, independent living, personal care, dementia and memory support care, and long-term care."[3]

---

[1] For purposes of a Motion to Dismiss for failure to state a claim, the facts alleged in Millar's Amended Complaint are assumed true.

[2] Am. Compl. ¶¶ 8, 11 [Doc. No. 6].

[3] *Id*. ¶ 11.

Plaintiff Millar is a licensed occupational therapist who was employed by Defendant as the Director of Rehabilitation.[4] The Village hired Millar on or about July 24, 2025 and terminated her on August 29, 2025.[5]

During her employment, Millar alleges that she "repeatedly complained to Defendant's management that therapy employees were engaging in negligent and/or fraudulent billing schemes in an effort to extract more revenue from Medicare and/or Medicaid."[6] For example, Millar complained that Defendant's occupational therapists and physical therapists "were permitted and/or directed to co-treat patients . . . without documenting clinical necessity or patient benefit as required by Medicare regulations."[7] This means that both an occupational therapist and a physical therapist would treat a patient at the same time in one session, rather than each therapist having individual sessions with a patient.[8] "[E]ach therapist was billing as though they had treated the patient individually so Defendant could receive higher payments from Medicare while doing less actual work."[9] Millar alleges that Medicare regulations permit co-treatment only when there is a documented medical need, and it is not permitted for convenience or productivity as she alleges Defendant employs the practice.[10] Plaintiff further complained and objected to management that occupational and physical therapists would bill Medicare for time not spent with patients.[11] For example, the Village's management insisted that occupational and

[4] *Id*. ¶¶ 12, 13.

[5] *Id*. ¶ 13.

[6] *Id*. ¶ 15.

[7] *Id*. ¶ 17.

[8] *Id*. ¶ 18.

[9] *Id*. ¶ 21.

[10] *Id*. ¶ 19.

[11] *Id*. ¶¶ 21-25.

physical therapists hit "certain 'productivity quotas.' At month's end, [the therapists] would frequently retroactively alter session lengths and billing codes to meet Defendant's productivity requirements."[12] Further, the Village allowed and directed therapists to "bill Medicare for full session lengths (e.g. 45 minutes) despite spending significantly less time (often only 20-30 minutes) with the patient."[13] Following Millar's complaints, these practices continued.[14]

Millar also made complaints to her supervisors that other employees provided negligent care, including providing patients less care than was prescribed and incorrectly reporting that patients refused treatment, which resulted in a "rate of 'patient refusals' [of treatment] that grossly exceeded industry norms."[15] Millar specifically alleges that "Defendant's staff was falsely claiming that patients refused, were 'too tired' or 'were not appropriate for therapy because they were out of their mind.' "[16] These practices resulted in insurance providers and Medicare dropping patients from therapy before they were medically prepared to do so.[17]

In response to Millar's complaints, Defendant did not take action to remedy the issues. When she noted that a patient who suffered a fall after not wearing non-skid socks should be screened after the fall, Defendant's Director of Nursing Sheila Keyser "yelled at Plaintiff that they 'do things our way' and 'if we don't think its [sic] necessary to evaluate a patient because she has dementia and fell on the bathroom floor then you will not evaluate.' "[18] After Millar contested this response, she was told "you will do things our way we may take your evaluation

---

[12] *Id*. ¶ 22.

[13] *Id*. ¶ 23.

[14] *Id*. ¶¶ 26-28.

[15] *Id*. ¶¶ 29-34.

[16] *Id*. ¶ 33.

[17] *Id*. ¶ 34.

[18] *Id*. ¶¶ 36-37.

into consideration, but ultimately the decision is ours if we want a patient to be picked up for therapy or not if we think they're not appropriate then they won't be picked up."[19]

Millar raised concerns of patient neglect and elder abuse, specifically "that patients over the age of 60 were, *inter alia*, being left in soiled garments, being left in bed for excessive amounts of time, were not being given proper evaluations and that patients with dementia were not getting therapy, because Defendant's practice was that dementia patients were 'not appropriate for therapy.'"[20] She "observed, reported, and repeatedly complained to" her supervisors, Keyser and the Village's Administrator/Executive Director Yoni Nussbaum, regarding the suspect billing practices and patient safety concerns immediately upon observing these alleged practices.[21]

In response to Millar's reports and complaints, the Village's management "frequently yelled at" her, "labeled her as 'argumentative' . . . and told her, 'we make the decisions around here not you. We run the show, what we say goes.'"[22]

On August 28, 2025, Millar and Nussbaum had a meeting to discuss Millar's complaints further.[23] Nussbaum told Millar that she "didn't know what she was talking about."[24] Millar ended the meeting and stated that "she refused to engage in illegal and fraudulent billing

[19] *Id*. ¶ 38.

[20] *Id*. ¶¶ 39-40.

[21] *Id*. ¶ 41.

[22] *Id*. ¶¶ 42-43 (emphasis and alterations omitted).

[23] *Id*. ¶ 44.

[24] *Id*. (alterations omitted).

practices."[25] The next day, on August 29, 2025, Nussbaum terminated Millar's employment and told her that Millar "was not a good fit" for the Village.[26]

On December 4, 2025, Millar filed the instant lawsuit against the Village, alleging counts related to her termination.[27] Defendant moved to dismiss the Initial Complaint,[28] and Millar filed the instant Amended Complaint.[29] Defendant then moved to dismiss Count III of the Amended Complaint.[30]

## II. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.[31] The Court must accept as true all factual allegations in the Complaint and draw all reasonable inferences in favor of Plaintiffs.[32] However, plaintiffs must plead "more than labels and conclusions," and "[f]actual allegations must be enough to raise the right to relief above the speculative level."[33] Courts consider the complaint in its entirety, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.[34]

---

[25] *Id*. ¶ 45.

[26] *Id*. ¶ 46.

[27] Compl. [Doc. No. 1].

[28] Def's. Mot. to Dismiss Initial Compl. [Doc. No. 5].

[29] Am. Compl. [Doc. No. 6]. A plaintiff may amend a complaint once as of right no later than "21 days after service of a motion under Rule 12(b)." Fed. R. Civ. P. 15(a)(1)(B). Millar filed the Amended Complaint within 21 days of Defendant's Motion to Dismiss the Initial Complaint, so the amendment is permissible.

[30] Def's. Mot. to Dismiss [Doc. No. 9].

[31] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

[32] *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023).

[33] *Twombly*, 550 U.S. at 545.

[34] *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

## III. Discussion

Defendant moves to dismiss only Count III of the Amended Complaint, which alleges violation of OAPSA. OAPSA encourages individuals who have "reasonable cause to believe that an older adult is in need of protective services" to report such information to a local agency responsible for elder protection.[35] The Act establishes penalties for employers who (a) retaliate against an employee who made a report or (b) intimidate an employee who hasn't yet made a report but has sufficient knowledge to do so.[36] In her Amended Complaint, Millar asserts an intimidation claim under 35 Pa. Stat. Ann. § 10225.302(c.1) of OAPSA.[37] Under OAPSA's intimidation provision, "[a]ny person . . . with knowledge sufficient to justify making a report . . . shall be free from any intimidation by an employer or by any other person or entity."[38]

Defendant moves to dismiss on the basis that Plaintiff did not "plead facts plausibly showing she made a report to an agency regarding an older adult . . . in need of protective services, and that Bryn Mawr Village took an adverse action against her because of the report."[39] The terms of the OAPSA intimidation provision do not require a report to an agency prior to the alleged intimidation. A person bringing a claim must have "knowledge sufficient to justify making a report," but there is no reporting requirement.[40] Nor does Defendant point to any cases wherein a court has required a report to an agency for a plaintiff to proceed on an intimidation claim. Therefore, Millar is not required to allege that she made a report to an agency in order to state an OAPSA intimidation claim.

---

[35] 35 Pa. Cons. Stat. § 10225.302(a) (West).

[36] 35 Pa. Cons. Stat. §§ 10225.302(c), (c.1) (West).

[37] Am. Compl. ¶ 65 [Doc. No. 6].

[38] 35 Pa. Cons. Stat. § 10225.302(c.1) (West).

[39] Def.'s Mem. L. Supp. Mot. to Dismiss at 3 [Doc. No. 9-2] (internal quotations omitted).

[40] 35 Pa. Cons. Stat. § 10225.302(c.1) (West).

Defendant further argues that OAPSA's intimidation provision does not apply to termination.[41] While Plaintiff's Initial Complaint cited the retaliation provision of OAPSA, the Amended Complaint solely brings an OAPSA intimidation claim.[42] The retaliation provision of OAPSA states that "Any person making a report [to] the agency . . . shall be free from any discriminatory, retaliatory or disciplinary action by an employer or by any other person or entity."[43] An agency is "[t]he local provider of protective services."[44] OAPSA does not define retaliation.[45] Defendant argues, without citation, that the retaliation provision "would undeniably apply to the facts present [in Millar's Amended Complaint.]"[46]

Whether the OAPSA intimidation provision applies to termination of an employee is a matter of first impression for the Court. The parties did not identify, nor could the Court locate, any cases in Pennsylvania state court or the federal courts interpreting the intimidation OAPSA provision. "When ascertaining Pennsylvania law, the decisions of the Pennsylvania Supreme Court are the authoritative source."[47] As the Pennsylvania Supreme Court has not ruled on this provision, the Court "must predict how it would rule."[48] "When interpreting Pennsylvania law, we apply its rules of statutory interpretation."[49]

---

[41] Def.'s Mem. L. Supp. Mot. to Dismiss at 5-6 [Doc. No. 9-2].

[42] *Compare* Initial Compl. ¶¶ 64-66 [Doc. No. 1] *with* Am. Compl. ¶¶ 64-65 [Doc. No. 6].

[43] 35 Pa. Cons. Stat. § 10225.302(c) (West).

[44] 35 Pa. Cons. Stat. § 10225.103 (West).

[45] *Id.*

[46] Def.'s Mem. L. Supp. Mot. to Dismiss at 5 [Doc. No. 9-2].

[47] *Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 216 (3d Cir. 2010).

[48] *Id*.

[49] *In re Trustees of Conneaut Lake Park, Inc.*, 855 F.3d 519, 523 (3d Cir. 2017).

Under Pennsylvania law, "[e]very statute shall be construed, if possible, to give effect to all its provisions."[50] "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."[51] "When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering:" the "occasion and necessity for the statute," "mischief to be remedied," and "consequences of a particular interpretation," among other factors.[52]

Thus, the Court starts with the plain language of OAPSA's intimidation provision and definition of intimidation. Intimidation is "[a]n act or omission by any person or entity toward another person which is intended to, or with knowledge that the act or omission will, obstruct, impede, impair, prevent or interfere with the administration of this act or any law intended to protect older adults from mistreatment."[53] The OAPSA provision protects anyone "with knowledge sufficient to justify making a report" from intimidation by an employer.[54] Thus, Millar is protected if she had knowledge sufficient to justify making a report and Defendant took an action toward her which was intended to, or with the knowledge that the action would, "obstruct, impair, prevent or interfere" with any law intended to protect older adults from mistreatment.

Terminating an employee who has observed and raised concerns regarding unlawful practices and mistreatment of older adults may very well obstruct, impair, prevent, or interfere with laws intended to protect older adults. Specifically, a termination may put an employee in a

---

[50] 1 Pa. Cons. Stat. § 1921(a).

[51] 1 Pa. Cons. Stat. § 1921(b).

[52] 1 Pa. Cons. Stat. § 1921(c).

[53] 35 Pa. Cons. Stat. § 10225.103.

[54] 35 Pa. Cons. Stat. § 10225.302(c.1).

more precarious position and less likely to file a report with an agency or continue raising concerns regarding the alleged unlawful practices.

An analysis of the statute in its entirety reveals distinct intentions by the General Assembly in enacting the retaliation and intimidation provisions. The retaliation provision protects against "discriminatory, retaliatory, or disciplinary" actions taken following a report to an agency. The intimidation provision, rather, protects against actions taken without the filing of a report that may dissuade a person from making a report or otherwise acting to enforce laws protecting against the mistreatment of older adults. It would be redundant, and inconsistent with the plain reading of the provision, to require a report to an agency prior to an intimidation claim because then the claim would necessarily be a retaliation claim. Similarly, it would oppose the letter and the spirit of the statue to judicially determine that certain actions that are "discriminatory, retaliatory, or disciplinary" cannot be taken with the intent or knowledge of "obstruct[ing], impair[ing], prevent[ing] or interfere[ing]" with any law intended to protect older adults from mistreatment and subject to the intimidation provision. Accordingly, the Court declines to rule that OAPSA sets a blanket prohibition on bringing allegations of termination under the intimidation provision.

Still, Millar must allege sufficient facts to state a claim of OAPSA intimidation. She must allege that (1) she had knowledge sufficient to justify making a report; (2) that Defendant acted toward Millar with the intention or knowledge (3) that its actions would obstruct, impair, prevent, or interfere with a law intended to protect older adults.[55] Millar alleges that she witnessed a disregard of Medicare guidelines by failure to evaluate a patient who fell, improper billing practices by occupational and physical therapists that violated alignment with Medicare

[55] 35 Pa. Cons. Stat. §§ 10225.103, 10225.302(c.1).

regulations and resulted in patients not receiving care proscribed to them, and patients "being left in soiled garments, being left in bed for excessive amounts of time, not being given proper evaluations and that patients with dementia were not getting therapy."[56] These factual allegations are sufficient to establish that Millar had knowledge sufficient to justify making a report to an agency.

The Village then terminated Millar after just over one month of employment, during which Millar repeatedly raised concerns regarding the standard of care for patients.[57] When she raised these concerns, the director of nursing yelled at her, saying "you will do things our way [sic] we may take your evaluation into consideration."[58] When Plaintiff made internal "complaints of patient neglect and elder abuse, [she] was told to be quiet and that she was 'rocking the waters.'"[59]

Finally, Millar had a meeting with Nussbaum at which she sought to further discuss her complaints and concerns.[60] In this meeting, Nussbaum told Millar that she "didn't know what [she] was talking about," and Millar ended the meeting and told Nussbaum "that she refused to engage in illegal and fraudulent billing practices."[61] *The very next day*, Nussbaum terminated Millar. These factual allegations are sufficient to state a claim and for the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."[62]

---

[56] Am. Compl. ¶ 39 [Doc. No. 6].

[57] *Id.* ¶¶ 13, 15.

[58] *Id.* ¶ 38.

[59] *Id.* ¶ 40.

[60] *Id.* ¶ 44.

[61] *Id.* ¶¶ 44-45.

[62] *Iqbal*, 556 U.S. 662 at 678.

## IV. CONCLUSION

Because Millar sufficiently stated a claim for OAPSA intimidation, the Motion to Dismiss Count III will be denied. An appropriate order will be entered.